Argued October 26, 1971, affirmed January 19, 1972

MARTIN, *Respondent, v.* McCAIGE, *Appellant.*

492 P2d 770

*Thomas M. Mosgrove,* John Day, argued the cause and filed briefs for appellant.

*Milo W. Pope,* Milton-Freewater, argued the cause for respondent. With him on the brief were Roy Kilpatrick, and B. J. Matzen, John Day.

BRYSON, J.

Plaintiff brought an action at law for money had and received, and the defendants filed a general denial. The case was tried to the court and judgment was entered against the defendants. The court, on motion, granted a new trial to the defendant Barbara McCaige. John McCaige appeals from the judgment entered against him.

The plaintiff owned an operating ranch known as the Cawrse Ranch, in Grant County, Oregon. In 1966 the parties began negotiations for defendant to purchase the real and personal property of the ranch. The transaction was concluded and closed through escrow in February, 1967, by delivery of a deed and bill of sale. The defendant took possession of the ranch before the transaction was closed. The plaintiff had some cattle on the ranch which were not sold until the following March. The amount of the prayer of plaintiff's complaint represents the balance of money he claims is due him by defendant for wages to shared ranch employees, 55 tons of hay, a Valley Irrigation System with motor and pump, personal property taxes, fence posts, gas and oil, miscellaneous items, and interest.

Plaintiff contends that there was an oral agreement between plaintiff and defendant whereby defendant would pay plaintiff for the above items and that this was outside of the principal escrowed agreement of sale. Defendant contends he did not take possession of the ranch until February, 1967; "* * * we generally deny the claims of Mr. Martin that any liabilities are owed or that there is any contract to purchase these items or to make any of these payments."

■ Defendant's first assignment of error is that:

"The Court erred in allowing evidence of contracts for goods sold and delivered at an agreed price upon a complaint for money had and received. The complaint fails to state a cause of action on an express contract for goods sold and delivered, which on the evidence was the gravamen of plaintiff's cause of action."

The defendant argues that "the real gist of the action was on express contracts for goods sold and

delivered," and that "a cause of action for goods sold and delivered must allege that defendant is indebted to plaintiff in a specified sum for certain chattels sold and delivered to the defendant by the plaintiff at defendant's instance * * *."

■ The term *money had and received* is the technical designation of a form of common count declaration in assumpsit. An action for money had and received is an action at law but is equitable in nature and is governed by equitable principles.

In *Sharp v. McCargar et al,* 114 Or 435, 441, 236 P 262 (1925), the following rule was enunciated:

"It is certain that a cause of action is stated, whether it be considered an action in general *assumpsit* or on an express contract. Since the complaint was not challenged by motion or demurrer, we are of opinion that defendants' contention is untenable if the proof supports either theory. We are not unmindful of the rule that an action for money had and received cannot be supported by proof of a special executory contract, for the law will not imply a promise where an express promise exists: 5 C. J. 1386. In other words, the proof must support the theory of the complaint. It is also well established that where a contract has been fully performed by one party, and nothing remains to be done but the payment of money by the other, the party who has performed his part of the contract may sue for and recover the amount due under the common counts in *assumpsit,* using the contract as evidence: *Levin et al. v. Strempler,* 194 Ill App 299; 5 C. J. 1387; 2 R. C. L. 762. The rule that *assumpsit* does not lie where there is an express contract is applicable only when the contract is unexecuted. As quoted in *Freese v. Pavloski et al,* 39 R. I. 512 (99 Atl 13):

'When a contract has been fully executed and nothing remains to be done but the payment of

the price agreed on, the plaintiff may declare specially on the contract, or he may rely on the common counts in *indebitatus assumpsit.*' " 114 Or at 441, 442.

This rule was quoted with approval in *Wagner v. Savage, as Adm'r,* 195 Or 128, 145, 244 P2d 161 (1952).

There is nothing in the record to indicate that the defendant was taken by surprise or did not know what the plaintiff was contending. During opening statements, it was stated to the court as follows:

"However, we do understand the position of the plaintiff for the items sued upon. There has been some correspondence. Our position, however, is to the effect that there was never any contract for the purchase of the Valley System."

The evidence in this case shows that at the time the complaint was filed, all of the transactions had been completed and nothing remained to be done on the part of either party except the payment or non-payment by defendant. Plaintiff merely asserted that for the above reasons indicated there was a certain sum of money due to him. The court did not err in this respect.

The defendant next assigns that:

"The Court erred in granting judgment for the 'Valley System' because as a matter of law the transaction was within the Statute of Frauds, and as a matter of law the motor and pump were real property and passed to the defendant with the real estate contract."

The evidence discloses that "Valley System" is a "Valley Irrigating System" copyrighted and manufactured in Nebraska. It is a self-propelled circular system with a series of pipes mounted on wheels. It is

self-propelled by the force of the water and can be regulated to make the circle in a preset period of time, and is approximately one-quarter of a mile long. Plaintiff testified:

"A It was propelled by a water jack. That is, each wheel is regulated to correspond with the distance it has to travel.

"* * * * *.

"A The pump is a 250-horsepower pump, and the contract for its supply and all were there, and the starting motors and all.

"* * * * *.

"Q What was the pump?
"A Well, it was the pump that was engineered for this system."

One of the exhibits and the testimony clearly show that some nine other pumps of various horsepower were included in the sale but the "Valley System" was specifically not included in the original sale. On direct examination, the defendant testified:

"Q When you bought this property, * * * was the Valley System specifically excluded from the purchase agreement?
"A It was.

"Q At a later date, approximately July of 1968, did you discuss with Mr. Martin the possibility of either buying or trying out this Valley System before you purchased?
"A I so did."

However, the defendant also testified that he did not agree to purchase the Valley Irrigation System from the plaintiff. It is defendant's contention that he was

only trying the irrigation system out. On cross-examination defendant was asked:

"Q Now, you did call Mr. Martin in July of '68 about the sprinkler system?

"A Yah.

"Q And what did you tell him? What did you say to him?

"* * * * *.

"A In response to what he said, I would like to use it before I even thought of buying it. And that's it."

The testimony further shows that defendant did use the Valley Irrigation System and the 250-horsepower motor and pump in irrigating the ranch he had purchased from plaintiff. Some parts were missing, including a 6" and an 8" gate valve, and he requested that they be sent to him by the plaintiff. Defendant put these valves in the water line between the pump and the pivot point of the irrigating system. Defendant further testified on cross-examination as follows:

"Q Do you remember being in his office [the county assessor] on October 23rd, 1968? * * * You wanted the irrigation system to be segregated from Martin's [plaintiff] return for '68 and that you would assume the tax on the system?

"A Yes, I did.

"Q And you paid the tax?
"A Yes, I did."

The above indicates there was a conflict of testimony as to whether or not the defendant agreed to purchase and pay for the irrigating system. There was also a conflict of testimony on the question of

whether or not the Valley Irrigation System included the 250-horsepower motor and pump which supplied the water for the irrigating system from a well of approximately 375 feet in depth. The evidence discloses that the concrete slab on the well was made for this particular pump and motor; that the pump and motor is set on bolts with a shaft going down 375 feet. The defendant contends that the motor and pump were permanent fixtures and part of the real property which he acquired by deed. The plaintiff contends to the contrary. Exhibit #26, offered by the plaintiff and received in evidence, was a mortgage by plaintiff to the Connecticut Mutual Life Insurance Company. This lists some eleven pumps and motors of varying horsepower but does not include the 250-horsepower motor and pump. It should be understood that one of the items in plaintiff's claim against defendant is for the "Valley Irrigation System, Pump & Motor $7,500.00."

Applicable sections of the Uniform Commercial Code—Sales provide:

ORS 71.2060.

"(1) Except in the cases described in subsection (2) of this section a contract for the sale of personal property is not enforceable by way of action or defense beyond $5,000 in amount or value of remedy unless there is some writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by his authorized agent.

"(2) Subsection (1) of this section *does not apply to contracts for the sale of goods * * *.*" (Emphasis supplied.)

ORS 72.1050.

"(1) 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, * * *. 'Goods' also includes * * * other identified things attached to realty as described in ORS 72.1070 on goods to be severed from realty.

"* * * * * *"

ORS 72.1070.

"(1) A contract for the sale of minerals or the like or a structure or its materials to be removed from realty * * *.

"(2) A contract for the sale apart from the land of * * * other things attached to realty and capable of severance without material harm thereto but not described in subsection (1) of this section * * * is a contract for the sale of goods within ORS 72.1010 to 72.7250 whether the subject matter is to be severed by the buyer or by the seller even though it forms part of the realty at the time of contracting, * * *.

"* * * * * *"

ORS 72.2010.

"(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker * * *.

"* * * * *

"(3) A contract which does not satisfy the requirements of subsection (1) of this section but which is valid in other respects is enforceable:

"* * * * *

"(c) With respect to goods * * * which have been received and accepted in accordance with ORS 72.6060."

Goodwin, How The Adoption Of The Uniform Commercial Code Would Affect The Law Of Sales In Oregon, 30 Or L Rev 139 (1951), discussing "Section 2-201. [U. C. C.] Formal Requirements: Statute of Frauds," now ORS 72.2010, at page 152, states:

"* * * [A] transaction can be taken out of the statute of frauds if the buyer pays part of the purchase price or actually accepts part of the goods. * * * But once the jury finds that there has been an actual accepentance [sic] and receipt of goods pursuant to the claimed contract, then the whole contract is saved from the operation of the statute of frauds. The proposed subsec. (3)(c) would limit the operation of the acceptance and receipt of goods to save the contract only with respect to the amount of money paid or goods received * * *."

In Oregon's Uniform Commercial Code With Comments and Index and Tables, published in 1962 by the Legislative Counsel Committee, it is stated, in reference to ORS 72.2010, as follows:

"Receipt and acceptance either of goods or of the price constitutes an unambiguous overt admission by both parties that a contract actually exists * * *."

This assignment of error by the defendant involves both a question of law and a question of fact. There is conflicting testimony on the facts.

The trial judge rendered a memorandum opinion which is part of the designated record on appeal. He states therein:

"(3) There was proof that the defendant, John

McCaige, requested the items, and there was proof of the value of the items.

"* * * * *.

"This court did find that John McCaige accepted the goods under ORS 72.6060(1)(c) and that the statute of frauds was satisfied."

The findings of fact and judgment of the trial court generally find for the plaintiff and specifically provide that defendant John McCaige is indebted to plaintiff as of October 23, 1968, for a sprinkler system in the amount of $7,500. From a close examination of all of the testimony on this subject, we are of the opinion that the plaintiff carried his burden of proof and was entitled to recover from the defendant for the Valley Irrigation System, and that the system included the 250-horsepower motor and pump. In *Dean Vincent, Inc. et al v. Redisco, Inc.*, 232 Or 170, 174, 373 P2d 995 (1962), this court stated:

"* * * Whether such property retains its character as personal property or loses its separate identity in the real property depends upon a combination of factors. These factors are usually spoken of as annexation, adaptation, and intention. Intention is the most important and the most difficult factor to apply. It must be objective, and not some secret plan or mental reservation * * *."

Our position that the 250-horsepower motor and pump is part of the Valley Irrigation System is supported by *Roseburg Nat. Bank v. Camp*, 89 Or 67, 74, 173 P 313 (1918). *See also First State Etc. Bank v. Oliver et al*, 101 Or 42, 49, 198 P 920 (1921), which involved two irrigation pumps and a moveable motor.

In this case there is substantial evidence, although contradicted, to support the trial court's finding that the contracting parties orally agreed to constructively

sever the 250-horsepower motor and pump from the realty and thereafter consider the same subject to an oral agreement at a buy and sell price of $7,500. In *Landigan v. Mayer*, 32 Or 245, 250, 51 P 649 (1898), the court stated:

> "* * * [W]here chattels are of such a nature as that they do not lose their distinctive identity by annexation, and do not thereby become so essentially a part of the structure as that their removal will materially injure or destroy the structure, or destroy or unnecessarily impair the value of the chattels, their original character may be preserved by agreement of the parties interested: [Citations omitted]."

In *Dean Vincent, Inc. v. Redisco, Inc., supra* at 177, we stated:

> "* * * Under both sections of the code, the old and the new [Uniform Commercial Code], the results in a given case may differ, but the determination of the character of the goods sold as either real or personal property is left to the common law * * *."

Having decided that the sale of the Valley Irrigation System and the motor and pump were one transaction involving "the sale of goods," we conclude, pursuant to the aforesaid statutes, that the transaction was not within the statute of frauds and the court did not err in this respect.

■ The defendant next contends that the court erred in granting plaintiff judgment for 55 tons of hay, arguing that there was a complete failure of proof of any agreement of the defendant to pay for the 55 tons of hay which the plaintiff contended was sold to the defendant and consumed by the defendant's cattle. The bill of sale from the plaintiff to the defendant included 300 tons of hay, but the plaintiff contends that when he

moved his cattle off the ranch in March, 1967, there were 355 tons of hay remaining and that the defendant either sold it or fed it to his cattle. The evidence indicates that the defendant sold at least 67½ tons of hay for $1,703.19 between March 20 and April 11, 1967. Again there was a conflict of testimony on the question of whether or not the defendant received an additional 55 tons of hay over and above that amount of hay covered in the bill of sale. The trial court's findings of fact included that defendant was indebted to the plaintiff as of February 21, 1967, for the following amounts:

"For money advanced for
labor                              $   460.80
For money advanced for
gas & oil                              129.60
For a horse                            350.00
For hay                              1,375.00
                                     1,214.30 [sic 2,315.40]
Less credit                             25.00
                                    $2,290.40

and plaintiff is entitled to judgment for the amount of $2,290.40, with interest at 6% per annum from February 21, 1967."

There is evidence in the record that supports the trial court's findings.

"In a law action tried by the court without a jury, the court's findings have the force and effect of a jury verdict and must be affirmed on appeal if supported by any substantial evidence. Constitution of Oregon, Article VII, § 3; ORS 17.435; *Fabre v. Halvorson,* 250 Or 238, 239, 441 P2d 640 (1968); *Kuzmanich v. United Fire and Casualty,* 242 Or 529, 531, 410 P2d 812 (1966)." *Lloyd Corporation v. O'Connor,* 258 Or 33, 479 P2d 744 (1971).

■ The defendant's last assignment of error is that the court erred in receiving in evidence Exhibits 1, 9 and 17 over objection, the primary objection being that they were self-serving. Exhibits 1 and 17 were letters to defendant from the plaintiff, and Exhibit 9 is a copy of a letter from Mr. Lubersky, plaintiff's attorney, to defendant's attorney. The same objection was grounds 7 and 8 of the defendant's motion for a new trial, which was denied by the court as to the defendant John McCaige. The court rendered a memorandum opinion, part of the designated record in this case, in which he states "[t]here may be some question about the admissibility of some of the letters that were admitted into evidence. But in any event, the court did not read them, and they were not considered in reaching the result. This is borne out by the fact that the court gave its decision from the bench at the conclusion of the evidence."

Defendant contends in his brief that, "[t]here is nothing in the record to show that the judge as the trier of fact did not consider the matters set forth in the improperly received exhibits." This contention alone is not sufficient to constitute reversible error. In *Lenahan v. Leach*, 245 Or 496, 500, 422 P2d 683 (1967), we said if it was error to receive the challenged testimony, "* * * the law presumes, when there is no jury, that the court ignored the inadmissible evidence unless there is a showing that the court relied upon it in making a decision * * *." We have no reason to disbelieve the court's statement in his memorandum opinion to the effect that he did not read or consider the letters which were received in evidence. There is no showing in the record that the court relied upon any of the three exhibits in making its decision.

The judgment of the trial court is affirmed.